NUMBER 13-08-00228-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

GUILLERMO PANIAGUA PANIAGUA, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 329th District Court

of Wharton County, Texas.

 


 MEMORANDUM OPINION

 

Before Chief Justice Valdez and Justices Rodriguez and Garza


 Memorandum Opinion by Chief Justice Valdez
 A jury found appellant, Guillermo Paniagua Paniagua, guilty of felony murder, a first-degree felony. See Tex. Penal Code Ann. §§ 19.02(b)(3), (c) (Vernon 2003), 49.09(b)(2)
(Vernon Supp. 2009). The jury assessed punishment at ninety years' imprisonment and
a fine of $10,000. Paniagua raises the following issues on appeal: (1) the trial court erred
by denying his motion to suppress statements made to law enforcement officers because
he did not knowingly, intelligently, or voluntarily waive his rights; (2) trial counsel was
ineffective for failing to request an application paragraph on causation in the jury charge;
and (3) the evidence is legally and factually insufficient to support his conviction. We
affirm.

I. Background

 On January 19, 2007, at around 9:00 p.m., Taylor Ivy drove through the cold, misty
rain down FM 1301, a two-lane farm road connecting Boling to Wharton, Texas. A police
cruiser, driven by Chief Ernest Mendoza, passed Ivy and then re-entered the lane. 
Approximately thirty seconds later, Ivy saw Mendoza's taillights "go into the air and come
back down," indicating that a collision had occurred. Upon reaching the collision, Ivy saw
Medoza's car "kind of in the dead center of the road" and a pick-up truck, later identified
as Paniagua's, "more or less on the shoulder" of Mendoza's lane. Ivy pulled over, called
911, and checked Mendoza's condition but was unable to find a pulse. An autopsy report
later revealed that Mendoza's cause of death was blunt force trauma.

 John Loop, a passenger in Ivy's car, testified that Paniagua's truck "smelled of
alcohol" and that when Paniagua emerged from the driver's side of the truck he appeared
confused. Loop testified that he turned his attention to Mendoza and "lost track" of
Paniagua. 

 Later that night, Chad Allen, a motorist traveling on a different road and unaware
of the earlier collision, was waved down by Paniagua. Allen testified that Paniagua told
him that his truck had been stolen and that he needed a ride. Paniagua rode in the bed
of Allen's truck to a nearby gas station. Around midnight, Jerry Price, a Wharton County
Deputy Sheriff involved in the search for Paniagua, saw a man exit the bed of a truck at
a closed gas station. After identifying the man as Paniagua, Deputy Price placed him
under arrest, drove him to the scene of the collision, and released him to Texas
Department of Public Safety ("DPS") officers. 

 DPS Trooper Daniel Terronez testified that when he arrived at the scene of the
collision at 9:34 p.m., Paniagua was not present. Trooper Terronez and Trooper Todd
Respondek began an investigation. Trooper Terronez testified that the front passenger
sides of both vehicles sustained massive damage and that "gouge marks" were found in
Mendoza's lane. (1) Based on his experience and training in reconstruction, the position of
the gouge marks, and the positions of the vehicles, Trooper Terronez opined that the
collision occurred in Mendoza's lane. Trooper Terronez further testified that in his opinion,
Paniagua crossed the center stripe, drove onto the shoulder of Mendoza's lane and off the
edge of the pavement, then "over corrected or tried to get back up on the road," and that
the passenger side of Paniagua's truck was then struck by the passenger side of
Mendoza's car.

 Trooper Respondek testified that Mendoza suffered death as a result of the collision
and that the manner in which Paniagua was driving his truck made it capable of causing
death. Trooper Respondek opined that the gouge marks indicated the point of impact and
that at the point of impact, Mendoza's car was pressed down onto the asphalt under the
weight of Paniagua's truck. The defense refuted the State's description of the collision by
presenting testimony from Michael James, Ph. D., an accident reconstructionist. Dr.
James testified that, at the time of impact, Mendoza was traveling at least seventy miles
per hour and "each of the vehicles w[as] in the wrong lane."

 Trooper Respondek testified that Paniagua had bloodshot eyes and "an odor of
alcoholic beverage on him," and that a twelve-pack of beer was found in the cab of his
truck. Trooper Respondek took Paniagua to Gulf Coast Medical Center, and a blood test
revealed that at 12:50 a.m., Paniagua's blood alcohol content was .18, more than twice the
legal limit. The State presented retrograde extrapolation testimony that Paniagua's blood
alcohol content at the time of the collision was approximately .24, three times the legal
limit. 

 A jury convicted Paniagua of felony murder and assessed punishment at ninety
years' imprisonment and a $10,000 fine. This appeal ensued.

II. Legal and Factual Sufficiency

 In his third issue, Paniagua contends that the evidence is legally and factually
insufficient to support his conviction.

A. Standards of Review

 When reviewing the legal sufficiency of the evidence, we examine all of the
evidence in the light most favorable to the judgment to determine whether a rational trier
of fact could have found the essential elements of the crime beyond a reasonable doubt. 
See Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia,
443 U.S. 307, 318-19 (1979)). A jury's verdict will be upheld "unless a rational fact[-]finder
[would] have had reasonable doubt as to any essential element." Laster v. State, 275
S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting Jackson, 443 U.S. at 318-19). Although
we review all of the evidence presented at trial, we do not re-weigh the evidence or
substitute our judgment for that of the fact-finder. Utomi v. State, 243 S.W.3d 75, 78 (Tex.
App.-Houston [1st Dist.] 2007, pet. ref'd) (citing King v. State, 29 S.W.3d 556, 562 (Tex.
Crim. App. 2000). Inconsistencies in the evidence are resolved in favor of the judgment. 
Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

 In conducting a factual sufficiency review, we are "cognizant of the fact that a jury
has already passed on the facts"; therefore, we "must give due deference to the
determinations of the jury." Lancon v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). 
We review the evidence in a neutral light to determine whether "the evidence supporting
the verdict is so weak as to render the verdict clearly wrong or manifestly unjust." Id. We
will not reverse the jury's verdict unless we can say with some objective basis in the record
that the great weight and preponderance of the evidence contradicts the verdict. Watson
v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006).

B. Applicable Law

 Both legal and factual sufficiency are measured by the elements of the crime as
defined by the hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002,
pet. ref'd). Under a hypothetically correct jury charge, Paniagua committed the charged
offense if he committed or attempted to commit a felony other than manslaughter and, in
the course of and in furtherance of the commission or attempt, he committed or attempted
to commit an act clearly dangerous to human life that causes the death of an individual. 
See Tex. Penal Code Ann. § 19.02(b)(3). "A person commits [the offense of driving while
intoxicated] if the person is intoxicated while operating a motor vehicle in a public place." 
Id. § 49.04(a) (Vernon 2003). "Intoxicated" is defined as "not having the normal use of
mental or physical faculties by reason of the introduction of alcohol . . . into the body" or
"having an alcohol concentration of 0.08 or more." Id. § 49.01(2) (Vernon 2003). The
offense of driving while intoxicated is a felony if the person has previously been convicted
at least twice for driving while intoxicated. See id. § 49.09(b)(2).

C. Analysis

 The State presented evidence that gouge marks were found in Mendoza's lane. 
Trooper Terronez testified that he is trained in accident reconstruction and that, in his
opinion, Paniagua crossed the center line and caused the collision. Trooper Terronez
stated that the gouge marks were "fresh" (2) and that the position and freshness of the marks,
as well as the positions of the vehicles, indicated that the collision occurred in Mendoza's
lane. Trooper Terronez opined that, based on his investigation, Paniagua crossed the
center line. Trooper Respondek also testified that the impact occurred at the position of
the gouge marks. Trooper Respondek noted that the gouge marks were surrounded by
a debris field and that this indicated that Paniagua's truck struck Mendoza's car in
Mendoza's lane approximately four feet from the center line. Trooper Respondek testified
that the manner in which Paniagua had driven his truck that night made it capable of
causing death and that Mendoza's death was a result of the collision. Blood tests revealed
that at approximately 12:50 a.m. Paniagua's blood alcohol level was approximately two
times the legal limit, and the State's retrograde extrapolation expert testified that
Paniagua's blood alcohol level was three times the legal limit at the time of the collision. 
The State also presented evidence that soon after the collision, Paniagua's eyes were
bloodshot and he smelled of alcohol. Additionally, the defense stipulated to the
admissibility of two prior judgments of conviction for driving while intoxicated.

 The State did not present any eyewitness testimony that Paniagua crossed the
center line. Ivy and Long, occupants of a car traveling two hundred yards behind Mendoza
testified that Mendoza passed them approximately thirty seconds before the collision. 
Although Ivy testified that Mendoza did not "fly by" as he passed, Long testified that
Mendoza was driving eighty to eighty-five miles-per-hour when he passed. Dr. James,
Paniagua's accident reconstructionist, testified that just before the collision both Mendoza
and Paniagua were in the wrong lanes; however, Dr. James was unable to identify which
vehicle was the first to cross the center line. Dr. James also stated that the gouge marks
do not indicate the point of impact of the vehicles. Dr. James opined that when the
collision occurred, the vehicles overlapped and, when the vehicles separated, Paniagua's
truck came down with enough force to cause the gouge marks. Additionally, data
recorders indicating the speed changes of the vehicles moments before the collision were
not analyzed. 

 Viewing the evidence in the light most favorable to the verdict, and giving due
deference to the jury, see Lancon, 253 S.W.3d at 405, we conclude that a rational trier of
fact could have found beyond a reasonable doubt that Paniagua committed a felony by
driving while intoxicated while having two prior driving while intoxicated convictions and that
he committed an act clearly dangerous to human life that caused Mendoza's death. See
Laster, 275 S.W.3d at 518. Viewing the evidence in a neutral light, we cannot conclude
that the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust or that the jury's verdict is against the great weight and preponderance of the
evidence. Watson, 204 S.W.3d at 414-15. We conclude that the evidence is legally and
factually sufficient to support Paniagua's conviction. We overrule Paniagua's third issue.

III. Motion to Suppress

 Paniagua contends that the trial court erred by denying his request to suppress oral
statements made after his arrest. (3) The oral statements of which Paniagua complains were
used by the State's expert witness in conducting a retrograde extrapolation to determine
Paniagua's blood alcohol content at the time of the collision. (4) Specifically, Paniagua
argues that statements obtained during interrogation at Gulf Cost Medical Center shortly
after his arrest, as well as statements made during a later interrogation at the Wharton
County Jail, were obtained in violation of article 38.22 of the code of criminal procedure. 
See Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005).

A. Standard of Review

 A trial court's denial of a motion to suppress is reviewed for an abuse of discretion. 
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We review the evidence in
the light most favorable to the trial court's ruling, see Gutierrez v. State, 221 S.W.3d 680,
687 (Tex. Crim. App. 2007), and review the trial court's ruling under a bifurcated standard
of review, giving almost total deference to the trial court's rulings on (1) questions of
historical fact, even if the trial court's determination of those facts was not based on an
evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn
on an evaluation of credibility and demeanor. See Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007). However, when application-of-law-to-fact questions do not turn
on the credibility and demeanor of the witnesses, we review the trial court's rulings on
those questions de novo. See id.; Estrada v. State, 154 S.W.3d 604, 607 (Tex. Crim. App.
2005).

B. Analysis 

 Section 3 of the Texas Code of Criminal Procedure requires, inter alia, that "prior
to the statement but during the recording the accused is given the [warnings as required
by section 2(a)]" and "knowingly, intelligently, and voluntarily" waives those rights. (5) See
Tex. Code Crim. Proc. Ann. art. 38.22, § 3. Both sides agree that the warnings were
given; however, Paniagua argues that he did not "knowingly, intelligently, and voluntarily"
waive his rights because he was not specifically asked to waive, nor did he expressly waive
his rights. Additionally, Paniagua contends that he was too intoxicated at the hospital to
fully understand and waive his rights.

 In the present case, officers read Paniagua his rights in both English and Spanish
and asked if he understood them before questioning him. The trial court entered findings
of fact regarding Paniagua's understanding of his rights, including:

1) The court finds that defendant speaks sufficient English to understand
the warnings required by Texas Code of Criminal Procedure Article
38.22 and also speaks fluent Spanish.


2) The warnings as to defendant's right to remain silent, that any
statement he made may be used as evidence against him in court, to
have a lawyer present to advise him prior to and during any
questioning, if he was unable to employ a lawyer, he had the right to
have a lawyer appointed to advise him prior to and during any
questioning, and to terminate the interview at any time were provided
to the defendant in Spanish prior to the relevant interviews being
conducted.


 . . . .


8) The court finds that . . . no reasonable person could have failed to
understand the warnings given to the defendant prior to the instigation
of each of the two interviews at issue in this cause.


9) The court finds that the defendant did understand the warnings
referenced in finding #2 prior to agreeing to speak with agents of the
State in each of the two instances.

 

 . . . .


17) The court finds that defendant's actions and words, indicating that he
understood his rights, demonstrates that he fully understood those
rights . . . .


 The court's findings are supported by the record. At the hearing on Paniagua's
motion to suppress, Trooper Respondek testified that Paniagua nodded his head in the
affirmative after being read his rights in Spanish and asked if he understood. The trial
court also viewed a video showing Paniagua nod in the affirmative after his rights were
read in Spanish. Trooper Terronez testified that when he questioned Paniagua at the jail
later that day, he provided Paniagua with his article 38.22 warnings written in English and
played a Spanish recording that read each of the warnings. Following the Spanish
translation, Paniagua stated that he understood his rights and signed his name at the
bottom of a page that listed the warnings in English. 

 In order to comply with article 38.22, in addition to understanding his rights, a
defendant must voluntarily waive them in order for a statement to be admissible against
him. See id. It is well-established that section 38.22 does not require an express waiver. 
See Barefield v. State, 784 S.W.2d 38, 40 (Tex. Crim. App. 1989), overruled on other
grounds by Zimmerman v. State, 860 S.W.2d 89, 94 (Tex. Crim. App. 1993). In Barefield,
a defendant's oral confession was admitted at trial. Id. On appeal, the defendant argued
that because he was not asked whether he waived his rights prior to his confession, nor
did he expressly waive his rights, his confession should be suppressed. Id. The Texas
Court of Criminal Appeals held that the oral confession statute does not require an express
verbal waiver and that a waiver of rights may be inferred from the "totality of the
circumstances." Id. at 40-41. A defendant's statement is knowingly, intelligently, and
voluntarily made if a defendant is read his rights, indicates he understands them, and
proceeds without hesitation to discuss the offense. See Turner v. State, 252 S.W.3d 571,
583 (Tex. App.-Houston [14th Dist.] 2008, pet. ref'd); Hargrove v. State, 162 S.W.3d 313,
319 (Tex. App.-Fort Worth 2005, pet. ref'd).

 As previously discussed, Paniagua was read his rights and indicated that he
understood them. The trial court found that Paniagua "freely chose to waive [his rights]
when he voluntarily responded to the officers' questions." Although Paniagua never made
an explicit waiver of his rights, it is clear from the record that his statement was made
voluntarily. See Hargrove, 162 S.W.3d at 318-19 (finding that appellant implicitly waived
his rights where he was read his rights, indicated that he understood his rights, and
proceeded to discuss the offense); State v. Oliver, 29 S.W.3d 190, 193 (Tex. App.-San
Antonio 2000, pet. ref'd) (same). Both at the hospital and later at the jail, after indicating
that he understood his rights, Paniagua proceeded without hesitation to answer questions
about his actions on the day in question. Furthermore, nothing in either videotaped
statement indicates that Paniagua did not knowingly, intelligently, and voluntarily waive his
rights. See Hargrove, 162 S.W.3d at 318-19.

 Based on the totality of the circumstances, we conclude that, at both the hospital
and the Wharton County jail, Paniagua knowingly, intelligently, and voluntarily waived his
rights as required by article 38.22. See id. Accordingly, we conclude that the trial court did
not err by denying Paniagua's motion to suppress. Paniagua's first issue is overruled.

IV. Ineffective Assistance of Counsel

 In his second issue, Paniagua contends that he received ineffective assistance of
counsel because his trial counsel failed to request an application paragraph on the issue
of causation. 

A. Applicable Law

 Although the constitutional right to counsel ensures the right to reasonably effective
counsel, it does not guarantee errorless counsel whose competency or accuracy of
representation is to be judged by hindsight. Rylander v. State, 101 S.W.3d 107, 110 (Tex.
Crim. App. 2003). To prove ineffective assistance of counsel, Paniagua must show that
(1) counsel's performance fell below an objective standard of reasonableness, and (2)
there is a reasonable probability that, but for counsel's error, the result of the trial would
have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984); State v. Morales,
253 S.W.3d 686, 696 (Tex. Crim. App. 2008); Jaynes v. State, 216 S.W.3d 839, 851 (Tex.
App.-Corpus Christi 2006, no pet.). A failure to make a showing under either prong of the
Strickland standard defeats a claim of ineffective assistance of counsel. Rylander, 101
S.W.3d at 110-11.

 Paniagua must prove his claim of ineffective assistance of counsel by a
preponderance of the evidence. See Stafford v. State, 813 S.W.2d 503, 506 n.1 (Tex.
Crim. App. 1991). Our review of defense counsel's representation is highly deferential, and
we presume that counsel's actions fell within the wide range of reasonable and
professional assistance. Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

B. Analysis

 Paniagua argues that counsel's assistance was ineffective because the jury was not
given an application paragraph on the issue of causation and, therefore, the jury was
"unduly influenced by [Paniagua's] prior record for D.W.I., [and] his blood alcohol
concentration at the date and time of the accident" and "less concern[ed]" with whether
Mendoza or Paniagua "actually caused the collision." Paniagua contends that the jury
charge was defective because it failed to apply the law to the facts for the jury's benefit. 
Paniagua relies on Degrate v. State in support of this contention. 86 S.W.3d 751 (Tex.
App.-Waco 2002, pet. ref'd). Degrate is a manslaughter case in which the defendant set
forth the defensive theory that the victims caused their own deaths by failing to stop at a
stop sign and by failing to wear their seatbelts. Id. at 752. The jury charge in Degrate, as
in the present case, contained a correct instruction on causation; however, in Degrate, the
application paragraph made no reference to it. Id. at 753. Ineffective assistance of
counsel was not at issue in Degrate; instead, Degrate focused only on whether the trial
court erred by failing to instruct the jury on causation. Id. at 752. The Degrate court
concluded that the application paragraph was defective because it failed to refer to the
instruction on causation; however, the court found that such error did not cause the
defendant to suffer egregious harm Id. at 753. Accordingly, we conclude that the jury
charge in the present case was defective. (6) 

 A defective jury charge does not necessarily support a claim of ineffective
assistance of counsel. See Stewart v. State, 293 S.W.3d 853, 863-64 (Tex.
App.-Texarkana 2009, pet. filed) (concluding that defense counsel's failure to object to an
erroneous charge was not ineffective assistance). When evaluating the effectiveness of
counsel under the first prong of Strickland, we look to the totality of the representation and
the particular circumstances of each case. Thompson v. State, 9 S.W.3d 808, 813 (Tex.
Crim. App. 1999). The only complaint that Paniagua makes regarding trial counsel's
performance is that counsel failed to request that an application paragraph regarding
causation be placed in the jury charge. At the hearing on Paniagua's motion for new trial,
the court admitted trial counsel's signed and sworn affidavit stating, "My failure to request
an application paragraph was not a conscious decision and was not part of my trial
strategy. . . . " Assuming, arguendo, that counsel's performance fell below an objective
standard of reasonableness, Paniagua must nonetheless satisfy the second prong of
Strickland. See Strickland, 466 U.S. at 687; Jaynes, 216 S.W.3d at 851.

 Under Strickland's second prong, Paniagua must prove that there is a reasonable
probability that, but for counsel's error, the result of the trial would have been different. 
See Strickland, 466 U.S. at 687. In order to meet the second prong of Strickland,
Paniagua must prove that the complained of charge error deprived him of a fair trial. See
Schiffert v. State, 257 S.W.3d 6, 21-22 (Tex. App.-Fort Worth 2008, pet. dism'd) (holding
that where charge errors did not deprive appellant of a fair trial, counsel's failure to object
to those errors was not ineffective). "The Almanza standard for egregious harm--charge
error that deprived the defendant of a fair trial--is essentially the same as the second
prong of Strickland--counsel's error that deprived the defendant of a fair trial." Id. at 21.

 Although the application paragraph of the jury charge made no reference to
Paniagua's defensive theory of causation, the jury charge provided the following instruction
on causation:

A person is criminally responsible if the result would not have occurred but
for his conduct, operating either alone or concurrently with another cause,
unless the concurrent cause was clearly sufficient to produce the result and
the conduct of the actor clearly insufficient.


Additionally, although there was no direct eyewitness testimony as to which vehicle
crossed the center line and caused the collision, the jury heard evidence that gouge marks
were found in Mendoza's lane. Trooper Terronez opined that based on his training in
reconstruction, the position of the gouge marks, and the positions of the vehicles, the
collision was the result of Paniagua crossing into Mendoza's lane. The State also
presented testimony that Paniagua smelled of alcohol and that his eyes were bloodshot. 
Blood testing revealed that Paniagua's blood alcohol content was over two times the legal
limit hours after the collision, and retrograde extrapolation testimony revealed that
Paniagua's blood alcohol level was three times the legal limit at the time of the collision. 
Although Paniagua's accident reconstructionist expert testified that Mendoza's car was in
Paniagua's lane at the time of the collision, he further testified that Paniagua's vehicle was
in Mendoza's lane just before the impact. Moreover, Paniagua's accident reconstructionist
stated, "I cannot tell you more likely than not who crossed into the wrong lane first." 

 Based on the foregoing, Paniagua has failed to prove by a preponderance of the
evidence that but for counsel's alleged unprofessional conduct, the jury would have
returned a different verdict. See id. We, therefore, cannot conclude that trial counsel's
failure to request an application paragraph on the issue of causation deprived Paniagua
of a fair trial. Accordingly, Paniagua's second issue is overruled.V. Conclusion

 Having overruled all of Paniagua's issues, we affirm the trial court's judgment.


 ________________________

 ROGELIO VALDEZ

 Chief Justice 

Do not publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed the 

25th day of February, 2010. 
1. Trooper Terronez testified that "gouge marks" are indentations in the asphalt of a roadway and that
"[a] downward force or something has to fall off a vehicle or something has to be forced into the roadway to
cause a [gouge] mark." Additionally, he testified that gouge marks often indicate the "point of impact."
2. Trooper Terronez testified that "fresh" gouge marks are gouge marks recently created and that the
marks were "fresh" because they did not contain dirt, sediment, or oil.
3. Neither party requested, and the trial court did not initially enter findings of fact or conclusions of law. 
Article 38.22, section 6 of the code of criminal procedure imposes a mandatory duty on the trial court to file
written findings of fact and conclusions of law when the voluntariness of a statement is challenged. See Tex.
Code Crim. Proc. Ann. art. 38.22, § 6 (Vernon 2005); see also State v. Aguilar, No. PD-059-09, 2009 WL
636534, at *1 (Tex. Crim. App. March 11, 2009) (per curiam) (not designated for publication) (citing Urias v.
State, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004)). Accordingly, we abated this proceeding and remanded
to the trial court for compliance. After receiving the trial court's findings of fact and conclusions of law as to
the voluntariness of the challenged statements, this cause was reinstated and both parties filed post-submission briefs on the issue of voluntariness.
4. Paniagua argues that his answers to questions regarding "what time he ate, what he ate[,] how much
he had to drink, when he drank, how long since his last drink[,] and what time he started drinking" should not
have been used to conduct retrograde extrapolation because they were obtained in violation of article 38.22. 
See Tex. Code Crim. Proc. Ann. art. 38.22.
5. The section 2(a) warning requires the defendant be advised (1) he has the right to remain silent and
not make any statement at all and that any statement he makes may be used against him at his trial, (2) any
statement he makes may be used as evidence against him in court, (3) he has the right to have a lawyer
present to advise him prior to and during any questioning, (4) if he is unable to employ a lawyer, he has the
right to have a lawyer appointed to advise him prior to and during any questioning, and (5) he has the right
to terminate the interview at any time. See Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a) (Vernon 2005). The
section 2(a) warning is virtually identical to the Miranda warning, see Miranda v. Arizona, 384 U.S. 436 (1966),
with one exception--the admonition that an accused has the right to terminate the interview at any time. See
Herrera v. State, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).
6. Paniagua has not raised jury charge error as a separate issue on appeal.